**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————
                                              :
FUJI PHOTO FILM CO., LTD.,                    :
                                              :
                  Appellant/Appellee,         :     Hon. Stanley R. Chesler, U.S.D.J.
                                              :     Civil Action No. 08-1927 (SRC)
            v.                                :
                                              :
JACK C. BENUN,                                :     **OPINION**
                                              :
                  Appellee/Appellant.         :
—————————————————————:
                                              :
In re:                                        :
                                              :
JACK C. BENUN,                                :
                                              :
                  Debtor.                     :
—————————————————————:

**CHESLER, U.S.D.J.**

This matter comes before the Court on the consolidated appeals filed by Fuji Photo Film

Co., Ltd. ("Fuji") and Jack C. Benun ("Benun") of the order, opinion, and final judgment entered

on February 29, 2008 by the United States Bankruptcy Court for the District of New Jersey (the

"Bankruptcy Court"). The Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158.

For the reasons stated below, the decision of the Bankruptcy Court will be affirmed in part and

vacated in part.

## BACKGROUND

This case concerns infringement of patents related to disposable cameras. The litigation

history is long; in the opinion appealed from, the Bankruptcy Court termed it "epic." Fuji Photo

Film Co. v. Benun (In re Benun), 386 B.R. 59, 117 (Bankr. D.N.J. 2008). The Bankruptcy Court

summarized the pertinent history, which will not be repeated in detail here.  See id. at 65-69.  In

brief, Jazz Photo Corp. ("Jazz"), controlled by Benun, refurbished, imported, and sold lens-fitted

film packages ("LFFPs"), which are disposable, single-use cameras.  Fuji, owner of fifteen

patents for disposable cameras, pursued Benun and Jazz for patent infringement.

Infringement damages for two time periods have been at issue.  The period from 1995

through August 21, 2001 is known as Tranche I; the period from August 22, 2001 through

December 12, 2003 is known as Tranche II.  Although the decision appealed from concerns both

periods, during the pendency of this appeal, the Bankruptcy Court entered a consent order

resolving Fuji's claims relating to part of the Tranche II period, from July 2, 2003 through

December 12, 2003.

In 2003, in a case before Judge Hochberg of this district, after a jury trial, the district

court found that Jazz and Benun had infringed Fuji's patents during the Tranche I period, and the

court entered a judgment against Jazz and Benun in the amount of roughly $23 million.  Fuji

Photo Film Co. v. Jazz Photo Corp., 249 F. Supp. 2d 434, 459 (D.N.J. 2003) ("District Court I").

Shortly thereafter, both Jazz and Benun filed Chapter 11 petitions for bankruptcy; in 2005,

Benun's case was converted to Chapter 7.

On October 7, 2003, Fuji filed a Complaint seeking, inter alia, to deny Benun a discharge

of his debt to Fuji under § 526(a)(6) of the Bankruptcy Code.  In this adversary proceeding in

Benun's bankruptcy case, Fuji sought a judgment as to infringement damages for the Tranche II

period, to give its Tranche II claims liquidated debt status, as well as a determination of

exception to discharge for both tranches of damages.  After a trial taking twenty-three days over

nine months, on February 29, 2008, the Bankruptcy Court entered judgment: 1) excepting from

2

discharge that portion of the District Court I judgment attributable to Sesame Street™ cameras; 2) deeming Fuji's claim for inducement of infringement during the Tranche II period to be proven and liquidated; 3) excepting from discharge approximately $3.3 million in damages for the Tranche II period; 4) allowing post-judgment interest on item 3, but denying enhanced damages, attorneys' fees, and prejudgment interest. 386 B.R. at 118. Both parties appealed the Bankruptcy Court's decision, and the appeals were consolidated in the instant case.

## ANALYSIS

**I.     Legal Standards**

      **A.     Appeals from a Bankruptcy Court's decisions**

Pursuant to 28 U.S.C. § 158(a)(1), this Court has jurisdiction to hear appeals of the final judgments and orders of the Bankruptcy Court. This Court reviews the Bankruptcy Court's "legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." In re American Pad & Paper Co., 478 F.3d 546, 551 (3d Cir. 2007); see also Fed. R. Bankr. P. 8013. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

**II.    Fuji's appeal**

      **A.     The Kaplan Letter**

The parties do not dispute that Jazz inadvertently disclosed to Fuji a letter (the "Kaplan Letter") dated February 15, 2002 from Jeffrey Kaplan, Esq. to Anthony Cossentino, then the president of Jazz. On January 26, 2006, Fuji moved to depose Kaplan and to compel production

of certain documents from his files.  On February 6, 2006, the Bankruptcy Court heard argument

on the motion and conditionally denied it.  Fuju moved for reconsideration.  On March 10, 2006,

the Bankruptcy Court denied the motion for reconsideration and issued a detailed opinion on the

issues involved in these two motions.  See generally In re Benun, 339 B.R. 115 (Bankr. D.N.J.

2006).  This opinion provided a close examination of, inter alia, the issues of the attorney-client

privilege and use of the Kaplan Letter.  Id.  The opinion stated that, at the February 6, 2006

hearing, the Bankruptcy Court conditionally denied the motion: Fuji's motion was denied on the

condition that Benun waived assertion of any defense based on advice of counsel.  Id. at 122.

Benun then waived advice of counsel as a defense.  Id.

  In its final judgment, as to Tranche II willful and malicious injury, the Bankruptcy Court

distinguished between infringement due to refurbishment of previously reloaded LFFPs

("reloaded reloads") and infringement due to contamination of the shell supply with foreign

shells.  386 B.R. at 108.  As to the first category, the Bankruptcy Court found that Benun's

inducement of infringement was willful and malicious for the entire Tranche II period.  Id.  As to

the second category, the Bankruptcy Court found that Benun's inducement of infringement was

willful and malicious as of October 1, 2002.  Id.  Fuji does not explain how the Kaplan Letter

rulings contributed to the judgment, but it appears that Fuji contends that the rulings contributed

to the Court's decision that the period of willful and malicious infringement with regard to

foreign contamination began on October 1, 2002, rather than on an earlier date.

  On appeal, Fuji contends that, at trial, "Benun repeatedly put his belief as to the legality

of Jazz's conduct and advice of counsel at issue and thereby waived the privilege."  (Fuji's Br.

11.)  Fuji cites a number of points during Benun's testimony at trial at which he referred to

communications with counsel.  (<u>Id.</u> at 13-14.)  Fuji states that it moved to strike such testimony, but the Bankruptcy Court refused.  Fuji states that it asked to renew its motion to find waiver of privilege, and that the Bankruptcy Court denied it.  Fuji contends that, by not admitting the Kaplan Letter into evidence and not allowing Fuji discovery of Kaplan's advice to Benun, the Bankruptcy Court made erroneous and reversible evidentiary rulings.

One problem with Fuji's position is that its arguments mix together two distinct theories of appeal.  One theory of appeal holds that the Bankruptcy Court erred by admitting testimonial evidence it should have excluded: it erred by denying Fuji's motions to strike Benun's testimony concerning communications with counsel.  The other theory holds that the Bankruptcy Court erred by excluding documentary evidence it should have admitted, based on waiver of privilege: it erred by denying Fuji's request to admit the Kaplan Letter.  Fuji cannot have it both ways: this Court cannot sensibly tell the Bankruptcy Court that it should have both admitted testimony, and found that it waived the privilege, and also disallowed the same testimony.

Despite this ambiguity as to what the Bankruptcy Court's errors were, Fuji does make clear, however, the bottom line: "the erroneous evidentiary rulings contributed to the incorrect finding that Benun was not knowingly infringing Fuji's patents, but generally intended to satisfy the first sale requirements in the period after August 2001."  (Fuji's Br. 15.)

The Third Circuit applies the following principles to review of evidentiary rulings:

> Federal Rule of Evidence 103(a) provides that an evidentiary ruling is not reversible error 'unless a substantial right of a party is affected . . . .'  Fed. R. Evid. 103(a).  Under this test, a reviewing court should affirm the District Court despite the error if the reviewing court believes 'that it is highly probable that the error did not contribute to the judgment . . . .'

<u>Renda v. King</u>, 347 F.3d 550, 556 (3d Cir. 2003) (quoting <u>McQueeney v. Wilmington Trust Co.</u>,

779 F.2d 916, 924 (3d Cir. 1985)).

      1.    <u>The theory of erroneous admission of testimonial evidence</u>

The theory of erroneous admission of testimonial evidence holds that the Bankruptcy Court erred by admitting evidence it should have excluded: it erred by denying Fuji's motions to strike Benun's testimony concerning communications with counsel. Fuji appears to put little weight on this theory. Significantly, Fuji does not contend that the admission of this evidence contributed to the judgment that Benun's inducement of infringement was willful and malicious as of October 1, 2002. Nor does Fuji argue that that decision should be reversed because of the erroneous admission of Benun's testimony.

Indeed, there is nothing in the Bankruptcy Court's opinion which shows that Benun's testimony concerning communications with counsel played any role in the decision. The Bankruptcy Court provided a detailed statement of the factors weighing both for and against finding that the injury was willful and malicious. 386 B.R. at 103-107. This Court finds no evidence in the opinion that the Bankruptcy Court considered or relied on evidence pertaining to the advice of counsel. As Fuji does not explain how these rulings contributed to the judgment, this Court has no basis to conclude other than that it is highly probable that the rulings denying Fuji's motions to strike Benun's testimony did not contribute to the judgment.

      2.    <u>The theory of erroneous exclusion of documentary evidence</u>

Fuji argues that it was materially prejudiced by the Bankruptcy Court's erroneous decision to exclude the Kaplan Letter, because the Kaplan Letter would have shown that Benun was told that Jazz was infringing Fuji's patents prior to February 15, 2002. In its reply brief, Fuji fleshes out this argument, explaining that this evidence would have caused the Bankruptcy Court

6

to find willful and malicious infringement prior to October 1, 2002 – "at least as early as February 15, 2002."  (Fuji's Reply Br. 9.)  This point does not help Fuji, since the argument that a court would have arrived at a different decision had it considered inadmissible, privileged evidence fails to persuade that reversible error occurred.  Evidence protected by the attorney-client privilege – the kind parties fight about – is likely to be probative and to influence decisions, but that alone is insufficient to show error.  "Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue."  Rhone-Poulenc Rorer v. Home Indem. Co., 32 F.3d 851, 864 (3d Cir. 1994).  To show reversible error, Fuji must show that the Bankruptcy Court erred by allowing Benun to use advice of counsel as both a sword and a shield.  See In re Seagate Tech., LLC, 497 F.3d 1360, 1372 (Fed. Cir. 2007).  While privilege did shield attorney-client communications from discovery, there is no evidence that advice of counsel functioned as a sword here, that Benun put the advice of counsel at issue.

Fuji contends that Benun put the advice of counsel at issue, citing Livingstone v. North Belle Vernon Borough.  Yet Livingstone does not support Fuji's position.  In Livingstone, the Third Circuit quoted the Restatement of the Law Governing Lawyers § 130(1) (Final Draft No. 1, 1996) as follows:

> The attorney-client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that: (a) the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct.

91 F.3d 515, 537 (3d Cir. 1996).  Thus, under Livingstone, a mere mention of the advice of a

lawyer does not suffice to create a waiver of privilege if the client does not assert it as a material issue.

As Benun observes, the Livingstone Court distinguished Rhone-Poulenc on the basis of whether the "the substance of counsel's advice[] was an explicit element of the relevant legal analysis." Id. at 537 n. 36. In Livingstone, the appellant had not expressly waived the privilege, but contested the validity of a release-dismissal agreement. Id. at 537. The Third Circuit held that, even in the absence of an express waiver, because the advice of counsel was an explicit element of the voluntariness analysis, and thus essential to appellant's claim that the agreement was invalid, appellant had waived the protection of privilege. Id. The Court distinguished Rhone-Poulenc as a case in which there was no waiver of privilege because the client made reference to the advice of counsel in an attempt to establish state of mind and, while state of mind was an explicit element of the relevant legal analysis, advice of counsel was not. Id. at 537 n. 36.

In the instant case, Fuji does not contend that advice of counsel is an explicit element of the relevant legal analysis. Much like Rhone-Poulenc, the Bankruptcy Court stated that Benun's state of mind was an element of the willful and malicious injury inquiry, but did not find that advice of counsel was an explicit element of that analysis. 339 B.R. at 120, 122. Thus, under Rhone Poulenc and Livingstone, when the substance of counsel's advice is not an explicit element of the relevant legal analysis, nor asserted as a material issue, references to advice of counsel in the service of establishing state of mind are not sufficient to waive the protection of privilege.

This Court has reviewed the excerpts of Benun's trial testimony that Fuji contends put

8

advice of counsel at issue.  Viewed in the context of this case, these excerpts do not show that Benun placed the advice of counsel in issue.  Rather, the excerpts are not more than glancing references to the part that attorneys have played in Benun's efforts to comply with the law.

Very broadly speaking, one key set of issues at trial concerned Benun's conduct and state of mind with regard to compliance with patent law.  When a defendant in such a case is questioned about what actions he took to comply with the law during litigation that has gone on for the many years that this dispute has, he may well mention interactions with counsel.  All of the thirteen excerpts of testimony Fuji cites fall within this description.  The following excerpt epitomizes them:

> Q:   What steps did you and the other people you mentioned at Jazz U.S. take to assure that Jazz only refurbished single use camera shells first sold in the United States?
>
> A:   Well, there's a whole bunch of them.  First, I think the first thing we did was to contact the attorneys that the company relied upon and get their opinion as to exactly what we should do and how we should go forward.  I do believe there was a board meeting as well . . .

(4/11/07 Tr. 29:10-17.)  This does not constitute taking an affirmative step to place the substance of the advice of counsel in issue.  Benun here mentions consultation with counsel only very generally, and it goes only to the fact of having consulted counsel.  This Court does not understand these statements of steps taken to comply with patent law to place the substance of the particular communication in issue.

Furthermore, the Bankruptcy Court made clear that it did not, and would not, construe the testimony so as to allow use of advice of counsel as a defense.  Fuji cites one interchange in which, after the Court questioned Benun, Fuji moved to strike all answers that "relied on the

advice of counsel as being contrary to the rules of this case." (4/11/07 Tr. 65:16-18.)  The

Bankruptcy Court responded that it did not agree with that interpretation of the testimony:

> I don't read the testimony that way, and defense of advice of counsel, particularly
> as to Mr. Kaplan's advice, because that's really where we're dealing with the
> issue, is not available, and I've made that point several times.  And the basis for
> denying that defense as to Mr. Kaplan's advice is a function of the decision of this
> Court before this hearing began.  But having said that, Mr. Benun's response to
> this Court's question is what it is, and to the extent on reflection it's use of a
> defense that's not allowed, it won't be allowed, but I think the full text of the
> answer should remain on the record.

(4/11/07 Tr. 66:1-12.)  Moreover, several times, Benun's counsel objected to direct examination

questions on the basis of privilege, and the Bankruptcy Court allowed the questions.  (See, e.g.,

4/11/07 Tr. 50:5-10.)  Such objections would be inconsistent with an affirmative attempt to place

the advice of counsel in issue.

In sum, Fuji has not succeeded with either of its theories of appeal on the issue of

evidentiary rulings concerning the Kaplan Letter.  As to the theory of error by excluding the

Kaplan Letter, Fuji has not demonstrated that Benun affirmatively put the advice of counsel in

issue and thereby waived the protection of privilege.  The Bankruptcy Court did not abuse its

discretion in ruling that the Kaplan letter was protected by attorney-client privilege.  Livingstone,

91 F.3d at 524.  As to the theory of error by admitting Benun's testimony about communications

with counsel, Fuji has not demonstrated that the Bankruptcy Court's rulings admitting the

testimony were erroneous, and this Court concludes that it is highly probable that the rulings did

not contribute to the judgment.

      B.     The affirmative defense of permissible repair

"Repair is an affirmative defense to a claim of infringement, and Benun, as the party

raising the affirmative defense, had the burden of establishing this defense by a preponderance of the evidence.  The repair issue is a legal question based on underlying facts." Fuji Photo Film Co. v. ITC, 474 F.3d 1281, 1293 (Fed. Cir. 2007) (citation omitted).  The parties do not disagree about these points of law.

Fuji contends that the Federal Circuit also requires that proof of repair must be credible, complete, and verifiable.  In support, Fuji points to three decisions by the Federal Circuit during the course of this litigation.  None of these cases establishes such a requirement.  Rather, in all three decisions, the Federal Circuit refused to reverse the ruling appealed from and deferred to the factual findings of the tribunal below, citing  the weakness of the evidence in support of a contrary finding of fact.

Fuji begins by quoting from Jazz Photo Corp. v. ITC, 264 F.3d 1094, 1109 (Fed. Cir. 2001).  In that quote, the Court characterizes some evidence of permissible repair as incomplete and not credible.  Significantly, Fuji omits the last sentence of the paragraph it quotes: "For those respondents, the record contains insufficient basis on which to reverse the Commission's rulings." Id.  This sentence reveals that the Federal Circuit stated that the evidence in the record was insufficient to reverse the Commission's rulings – not that the evidence was insufficient as proof of permissible repair.  This case does not establish that proof of repair must be credible, complete, and verifiable.

Fuji next quotes Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1374 (Fed. Cir. 2005).  Again, the language quoted does contain the words "completeness" and "credibility" but, nonetheless, the Federal Circuit did not say what Fuji contends it said.  Rather, the Federal Circuit was supporting this statement: "This court cannot find that the district court clearly erred

11

in refusing to draw an inference about the five factories of which no Jazz representative had personal knowledge."  Id.  Again, the Federal Circuit stated that the evidence in the record did not give sufficient basis to reverse the trial court.

Lastly, Fuji contends that, in Fuji Photo Film Co. v. ITC, 474 F.3d 1281, 1295 (Fed. Cir. 2007), the Federal Circuit "confirmed Benun's burden on this issue by both factory and shell type within the factory."  (Fuji Br. 17-18.)  Fuji has misread this decision, which simply states, quoting the ITC decision appealed from: "The Commission found that 'there is a lack of complete and credible information verifying the LFFP refurbishing process at many of Jazz's supplier factories' and therefore that Jazz had failed to prove permissible repair for cameras made at these factories." Fuji III, 474 F.3d at 1295.  The Federal Circuit thus said that, given the absence of credible, complete, and verifying evidence, repair was not proven to the ITC, not that credible, complete, and verifiable evidence is required to prove repair.

These Federal Circuit cases thus establish no special evidentiary standards for proof of the affirmative defense of repair.  When Fuji argued to the Bankruptcy Court that the evidence of repair must be complete, credible, and verifiable, the Bankruptcy Court examined the Federal Circuit cases and declared, correctly, that a "preponderance of the evidence remains the requirement to establish the affirmative defense" of repair, and that Fuji's proposed embellishments of that standard were accurate only insofar as they expressed the usual weighting of proofs.  386 B.R. at 90.  It is thus straightforward for this Court to apply the "clearly erroneous" standard of review for factual determinations mandated by Fed. R. Bankr. P. 8013: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to

12

judge the credibility of the witnesses."

Fuji contends that the Bankruptcy Court "erred as a matter of law by shifting the burden of proof to Fuji to prove reconstruction." (Fuji's Br. 16.) This mischaracterizes what the Bankruptcy Court did. After observing that Benun's evidence supported a finding that Jazz had complied with the Federal Circuit's requirements for permissible repair, the Bankruptcy Court weighed Fuji's rebuttal evidence and observed that Fuji had offered no evidence of any impermissible repair. 386 B.R. at 90-93. The Bankruptcy Court observed that Fuji's rebuttal evidence not only failed to show impermissible repair but, in fact, "[a]ll such evidence universally illustrated a common theme of LFFP reloading in the Tranche II period which, though subject to variation, was in principle simple 'repair.'" Id. at 93. The Bankruptcy Court did not shift the burden of proof to Fuji to prove reconstruction. Rather, it received Fuji's rebuttal evidence, weighed it against Benun's evidence, and concluded that all the evidence showed permissible repair. This Court finds no error in how the Bankruptcy Court applied the burden of proof.

Although Fuji contends that it seeks review of the Bankruptcy Court's legal determinations, it argues at length about factual determinations. For example, Fuji objects strongly to the weight that the Bankruptcy Court gave to the declarations of Szeto, a Jazz employee, regarding the refurbishing process in various factories, on the basis of her alleged self-interest. (Fuji's Br. 18-19.) Fuji appears to want this Court to find error in the finder of fact's credibility determinations, but credibility determinations are uniquely the province of the finder of fact. See Fed. R. Bankr. P. 8013. Moreover, Fuji has not argued that the Bankruptcy Court's factual determinations were clearly erroneous and, absent that, Fuji has given this Court no basis

13

to review the Bankruptcy Court's factual findings on this matter.  Id.

      C.      Enhanced damages and attorneys' fees

Fuji contends that the Bankruptcy Court erred in denying enhanced damages, pursuant to 35 U.S.C. § 284, and attorneys' fees, pursuant to 35 U.S.C. § 285, because its decision was "based on a misapplication of the legal standards and a failure to take all of the relevant facts into account."  (Fuji's Br. 21.)

"A finding of willfulness does not mandate enhanced damages.  Rather, 'the paramount determination [for enhanced damages] . . . is the egregiousness of the defendant's conduct based on all the facts and circumstances.'"  Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1314 (Fed. Cir. 2002) (quoting Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992)).

"The decision to increase damages is committed to the discretion of the trial judge and a district court's refusal to award increased damages will not be overturned absent a clear showing of abuse of discretion."  Modine Mfg. Co. v. Allen Group, Inc., 917 F.2d 538, 543 (Fed. Cir. 1990).  "A district court abuses its discretion when its decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful."  Cybor Corp. v. Fas Techs., 138 F.3d 1448, 1460 (Fed. Cir. 1998).

Fuji first attacks the Bankruptcy Court's conclusion that Fuji had not proven willful inducement of infringement, within the meaning of patent law, contending that "reversal is required on the issue of willfulness."  (Fuji's Br. 25.)  The Bankruptcy Court, however, stated that, even if Fuji had established that all of Benun's conduct which the Bankruptcy Court found to be willful and malicious in the context of the Bankruptcy Code was also willful within the meaning of patent law, the court would still deny enhanced damages to Fuji.  386 B.R. at 115

14

n.97.  Given that, under Federal Circuit law, "a finding of willfulness does not mandate

enhanced damages," any error in the determination of willfulness must be harmless if the

Bankruptcy Court did not abuse its discretion in refusing to award enhanced damages even if

willfulness had been proven.  Riles, 298 F.3d at 1314.

As a throwaway argument, Fuji contends that the Bankruptcy Court abused its discretion

by not referencing nine factors listed in Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209,

1225 (Fed. Cir. 2006).  It is quite clear that the Federal Circuit has refused to limit the discretion

of trial courts by reducing the totality of the circumstances analysis to a defined set of a factors.

See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1342

(Fed. Cir. 2004).  Fuji makes no other argument that the Bankruptcy Court abused its discretion

in denying enhanced damages and attorney's fees.

The Federal Circuit has stated:

> District courts have broad discretion in determining the amount of enhanced
> damages to award and in calculating attorney's fees.  Indeed, they do not have to
> award such damages at all, in spite of a finding of willfulness, if the case presents
> reasons not to award them. . . [A] court is free to take into account factors related
> to the defendant's level of culpability, as well as other factors.

Harris Corp. v. Ericsson Inc., 417 F.3d 1241, 1259 (Fed. Cir. 2005).

The Bankruptcy Court carefully considered the question of enhanced damages.  See 386

B.R. at 111-116.  The Bankruptcy Court stated the factors underlying its conclusion that, under

the facts and circumstances of this case, Benun's conduct was not sufficiently egregious to merit

enhanced damages:

15

The following factors have influenced the court's exercise of discretion as to fees and damages: lack of clarity in the patent law (and efforts at or degree to which there was compliance with the law); contestability and/or imprecision as to facts establishing both infringement and damages; and, the heavy toll paid by Benun over the last decade and still to be paid as Fuji relentlessly pursues him. Moreover, the case taken as a whole (including the synergy of the stated factors as well as failed but plausible arguments by Benun) militates against enhancing damages and awarding fees. All of these considerations, as well as a clear distinction between circumstances of the bad faith holding in ITC II and this case's context, lead this court to deny enhancement damages and an award of fees.

386 B.R. at 112.

The Bankruptcy Court first considered Benun's conduct in the context of the developing Federal Circuit law of permissible repair, finding that, given Benun's implementing the Informed Compliance Program ("ICP") tracking system, his conduct was less than egregious. 386 B.R. at 112. The Bankruptcy Court next considered the facts establishing infringement, and found that the circumstances surrounding the two significant areas of infringement supported finding that the conduct involved was not egregious: 1) the incidence of reloads of reloads was relatively small; and 2) the post-September, 2002 failure to sort out foreign language shells was accompanied by implementation of the ICP system. Id. at 112-113. Next, the Bankruptcy Court reviewed the evidence and methodology on which the damages calculation was based and found that, in short, the relative lack of strength of this evidence weighed against awarding enhanced damages. Id. at 113-114. The Bankruptcy Court then observed that Jazz had been forced into bankruptcy, as well as the extent of the damage awards that would be or might be excepted from bankruptcy discharge, and found that "the net result without enhancement of damages or fees suffices." Id. at 114. Lastly, the Bankruptcy Court stated that the International Trade Commission's finding of bad faith should not be a basis for enhancing damages because the

Commission did not sufficiently credit Benun's compliance with the cease and desist order. <u>Id.</u> at 115-116.  The Bankruptcy Court based its denial of attorneys' fees on the same rationale. <u>Id.</u> at 116.

This Court finds the Bankruptcy Court's decision regarding enhanced damages, also applied to attorneys' fees, to be carefully reasoned,  persuasive, and advancing substantial justice. Particularly compelling is the Bankruptcy Court's statement that "courts are not required to accede in the bludgeoning of a thoroughly downed adversary."  386 B.R. at 117.  Fuji has not persuaded this Court that the Bankruptcy Court's "decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful."  <u>Cybor Corp.</u>, 138 F.3d at 1460.  The Bankruptcy Court did not abuse its discretion in refusing to award enhanced damages and attorneys' fees.

  D. <u>Prejudgment interest</u>

  In <u>GM Corp. v. Devex Corp.</u>, 461 U.S. 648, 657 (1983), the Supreme Court established the standard for awarding prejudgment interest, pursuant to 35 U.S.C. § 284: "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award." The Court explained the underlying rationale as follows:

> The standard governing the award of prejudgment interest under § 284 should be consistent with Congress' overriding purpose of affording patent owners complete compensation.  In light of that purpose, we conclude that prejudgment interest should ordinarily be awarded.  In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment.

Id. at 655-656.

The Court stated that the trial court exercises "some discretion" in awarding prejudgment interest, id. at 656, and the Federal Circuit has held that "the discretion of the district court in denying prejudgment interest is limited to specific circumstances." Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, 246 F.3d 1336, 1346 (Fed. Cir. 2001).  Denying prejudgment interest may be justified in a case, but "[t]he justification . . . must have some relationship to the award of prejudgment interest." Radio Steel & Mfg. Co. v. MTD Products, Inc., 788 F.2d 1554, 1558 (Fed. Cir. 1986).

In the instant case, it does not appear that the Bankruptcy Court's justifications for denying prejudgment interest are sufficiently related to the award of prejudgment interest.  The Bankruptcy Court stated that the decision to deny prejudgment interest was based on the same rationale as that underlying the decision to deny enhanced damages.  386 B.R. at 116.  This is problematic, since the relevant legal standards differ.  Although the same statutory provision, 35 U.S.C. § 284, provides the authority for the award of both enhanced damages and prejudgment interest, the language of the statute signals that Congress intended different standards for the two decisions: the statute states that "the court *shall* award the claimant damages adequate to compensate for the infringement, . . . together with interest . . ." but that "the court *may* increase the damages . . ."  35 U.S.C. § 284 (italics added).

In accord with this difference in language, the Supreme Court has held that, ordinarily, courts award prejudgment interest.  The Bankruptcy Court correctly recognized this but found that this was not an ordinary case.  386 B.R. at 116.  Yet the Bankruptcy Court's explanation for what makes the case atypical does not appear to meet Federal Circuit requirements for the

18

justification for finding an exception to the rule.  The Bankruptcy Court offered two reasons why this was not a typical case: 1) the law of the affirmative defense of repair has been developing; and 2) the case is "'thin' in its margin of proof of damages."  Id. at 117.  Neither of these reasons appears to have sufficient relationship to the award of prejudgment interest, as required by Radio Steel.  Nor do the other justifications cited by the Bankruptcy Court by incorporation of its explanation of its decision on prejudgment interest.  Even if it is correct that Fuji overstated its patent rights and is attempting to "bludgeon[] a throughly downed adversary," it is not clear what logical relationship this has to denying an award of prejudgment interest.[1]

The Supreme Court has held that "damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment."  GM Corp., 461 U.S. at 656.  The Bankruptcy Court found that Fuji was entitled to compensatory damages for patent infringement, and it used a reasonable royalty payment to calculate those damages.  If Fuji was entitled to a reasonable royalty payment, it would appear that, pursuant to GM Corp., Fuji might well be entitled under 35 U.S.C. § 284 to interest to compensate it for the time value of the money it was due.  If the Bankruptcy Court, in

---

[1] See also Group One, Ltd. v. Hallmark Cards, Inc., 407 F.3d 1297, 1308 (Fed. Cir. 2005).  In Group One, the Federal Circuit found that certain of the grounds for denial stated by the district court were not valid because they were "irrelevant to the right to receive interest on damages for infringement."  Id.  In the instant matter, it is not clear how the grounds stated by the Bankruptcy Court are relevant to Fuji's right to receive interest on its damages.

In a later section addressing the issue of additives to debt excepted from discharge, the Bankruptcy Court did raise the issue of Fuji's contribution to the delay in resolution of the case. 386 B.R. at 117.  The Supreme Court held that "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit."  GM Corp., 461 U.S. at 657.  The Bankruptcy Court did not, however, find *undue* delay, nor did it either link delay to the denial of prejudgment interest nor explain the relationship between the delay it found and the issue of interest.

the exercise of its limited discretion in this matter, decides that Fuji's damages do not include the forgone use of the royalty payment, the justification for this decision must be logically related to the question of entitlement to interest.

The Bankruptcy Court erred by not using the correct legal standard in the decision to deny prejudgment interest.  The Bankruptcy Court's decision to deny prejudgment interest will be vacated, and the matter will be remanded to the Bankruptcy Court for further proceedings in accordance with this Opinion.

E.      Tranche II willful and malicious injury

Fuji contends that the Bankruptcy Court erred in finding that, during the period of August 21, 2001 through September 30, 2002, Benun caused willful and malicious injury to Fuji only with regard to reloaded reloads, and not with regard to all types of refurbished LFFPs.  At the outset, Fuji states that it "does not contest the appropriateness of the test applied by the Bankruptcy Court."  (Fuji's Br. 30.)  That only leaves the Bankruptcy Court's factual determinations for review.  In a nutshell, Fuji does not dispute that there was evidence to support the Bankruptcy Court's factual determination, but asserts that there was contradictory evidence, and it disagrees with the Bankruptcy Court's weighing of the evidence and its credibility determinations.

Fuji argues that the Bankruptcy Court erred on five points: 1) "it is not understood how the Bankruptcy Court could credit Benun's testimony" (Fuji's Br. 36); 2) the Bankruptcy Court ignored the Federal Circuit's instruction that permissible repair requires use of only shells from cameras first sold in the U.S. (Id. at 37); 3) the Bankruptcy Court had "unjustified sympathy" for Benun (Id.); 4) the Court erred in finding that the period of willful and malicious injury relating

20

to foreign language shell sorting began on October 1, 2002, because that date "is just too late" and "a more logical date" is January 16, 2001 (Id.); and 5) the court credited the estimate of Jazz's reload market share provided by Benun in his testimony, rather than other evidence (Id. at 38-39).  With the exception of the second critique, these arguments are not more than disagreements with the Bankruptcy Court's weighing of the evidence and do not attack the Bankruptcy Court's factual determinations as clearly erroneous.  At most, Fuji argues that the Bankruptcy Court should have weighed the evidence differently, but does not even allege clear error.  This provides no basis for this Court to disturb the Bankruptcy Court's factual determinations.

Furthermore, the gist of the Bankruptcy Court's decision is that it found that the establishment of the ICP evidenced Benun's intent to comply with the first sale requirement during the period of August 21, 2001 through September 30, 2002.  The Bankruptcy Court relied on this inference in determining that the infringement (except in regard to reloaded reloads) during that time period did not constitute willful and malicious injury.  Fuji has not persuaded this Court that this determination is clearly erroneous.

As for the second argument, Fuji contends that the Bankruptcy Court's reasoning ignores the fact that, on August 21, 2001, the Federal Circuit issued its decision which held that permissible repair requires use of shells from cameras first sold in the U.S.  The Bankruptcy Court's opinion does not support Fuji's position.  The Bankruptcy Court expressly discussed the Federal Circuit's August 21, 2001 decision establishing the first sale requirement.  386 B.R. at 95-96.  The Bankruptcy Court found that the evidence showed that Benun had, in response to the decision, established the Informed Compliance Program, which was intended to satisfy the first

sale requirement.  Id. at 96.  In the opinion overall, the Federal Circuit's establishment of the first

sale requirement plays such a major role in the court's reasoning that Fuji's assertion that the

Bankruptcy Court ignored the Federal Circuit's establishment of the first sale requirement is

meritless.

**III.    Benun's appeal**

       A      <u>Willful and malicious injury</u>

Benun asserts that the Bankruptcy Court erred as a matter of law by employing an

objective component as part of the willfulness standard under 11 U.S.C. § 523(a)(6).  This

argument relies entirely on mischaracterization of the Bankruptcy Court's opinion.  In brief, the

Bankruptcy Court acknowledged the uncertainty about the law in this Circuit, due to questions

about the effect of <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998) on the holding of <u>Conte v.

Gautam (In re Conte)</u>, 33 F.3d 303, 305 (3d Cir. 1994).  386 B.R. at 75-79.  In applying the law

to the evidence, the Bankruptcy Court held that, using either a purely subjective test or a test

incorporating an objective component, Benun manifested the required state of mind during the

relevant time periods.  Id. at 102-111.  Since the Bankruptcy Court found that, using either the

purely subjective standard supported by Benun or the standard including an objective component,

the same outcome resulted, Benun has no basis for its assertion that the Bankruptcy Court's

willful and malicious injury determinations are erroneous as a matter of law.

       B.     <u>Shell arbitrage</u>

Benun contends that the Bankruptcy Court relied upon the clearly erroneous factual

determination that U.S. retailers engaged in shell arbitrage, for which it had no evidence.  This

argument suffers from an invalid premise, that the Bankruptcy Court relied "in large part" on the

fact of shell arbitrage in determining that Benun failed to prove satisfaction of the first sale requirement, and that the injury to Fuji was willful and malicious.  (Benun's Br. 43.) Examination of the opinion shows that the issues that were material to these decisions were the place of first sale of shells and the existence of foreign shells in Jazz's shell supply; shell arbitrage as the process by which the foreign shells came to enter the supply was a collateral matter.

The first sale requirement is an element of the affirmative defense of permissible repair, for which Benun bore the burden of proof.  The Bankruptcy Court concluded that the evidence showed that, in the Tranche II period, Fuji's survey evidence established that 40% of the shells did not meet the requirement of having been first sold in the U.S.  386 B.R. at 95-100.  The Bankruptcy Court summarized its determination as follows:

> Fuji's case against first sale is its survey-developed 40% factor. The 40% factor is based upon small samples taken from a sea of shells (handpicked by Fuji employees), and less than 500 Jazz LFFPs bought in retail establishments. Nevertheless, in the final analysis, this sampling is the only direct evidence available to this court which tests the origin of sale of actual Jazz LFFPs. Therefore, (i) in deference to ITC II and in recognition of its persuasive though not preclusive effect as to this issue, and (ii) given that the burden of persuasion (by a preponderance of evidence) weighs on Benun (and he has failed to carry that burden), this court finds that 60% of the shells at issue in Tranche II were first sold by Fuji or one of its licensees in the United States, while 40% could not be established as "first sold" in the United States.

Id. at 100.  Thus, while the Bankruptcy Court made passing mention of shell arbitrage in its discussion leading up to this conclusion, there is no indication that it relied at all, no less relied in large part, on any factual determination that shell arbitrage occurred.  The Bankruptcy Court did find, and relied on this finding, that there were shells with foreign first sale in Jazz's inventory, but how they got into the inventory – whether by shell arbitrage or some other process – was not

23

important.

   As to the finding of willful and malicious injury, Benun points to four points at which the

Bankruptcy Court referenced shell arbitrage in connection with its determination.  Careful

reading of the opinion, however, does not support Benun's argument.  At the first point, the

Bankruptcy Court included the following statement in a list of factors weighing against Benun's

position:

> Benun knew that first sold United States shells were being sold at premiums after
> August 2001 (prices nearly doubling, with rises of 30 [cent] to 35 [cent] per shell),
> thus providing an attractive market for shell arbitrage (and the potential for the
> importing of foreign shells to the United States, to be "palmed off" as having been
> first sold here);

Id. at 105.  In a footnote, the Bankruptcy Court cited the evidence in support of its findings about

the rise in shell prices.  Id. at 105 n.82.  The Bankruptcy Court did not conclude here that shell

arbitrage had occurred, but only that market conditions made it attractive to engage in.  Benun

has offered no basis to find this inference erroneous.

   At the second point, the Bankruptcy Court listed as a finding regarding willful and

malicious injury that, at some point, it "did become apparent to Benun[] that PRE's shell

purchases could well have been impacted by the shell arbitrage market."  Id. at 106.  The

Bankruptcy Court's point here is not that PRE actually engaged in shell arbitrage, but that Benun

knew that PRE could purchase shells with a foreign first sale.  The material issue was not

whether shell arbitrage actually occurred, but that "Benun's apparent failure to enforce PRE's

documentation requirements (the required certifications as to source), and otherwise inspect

PRE's purchases, was more than mere recklessness."  Id. at 106-107.  Again, the Bankruptcy

Court here was concerned about what Benun knew and did to prevent foreign shell

contamination, not whether shell arbitrage produced that contamination.  The third point Benun

cites in the opinion is a footnote in this same section, and the same comments apply.  Id. at 107

n.88.

At the fourth and most significant point, in the summary of Tranche II "willful and

malicious" findings, the Bankruptcy Court stated: "From and after October 1, 2002 (through

December 12, 2003), Benun knew that PRE's shell supply was subject to foreign shell

'contamination' arising from market conditions (shell arbitrage and the potential for 'palming

off' foreign shells as United States sold)."  Id. at 108.  Again, the material issue here is whether

foreign shells were in Jazz's supply, not how they got there.

This Court finds no evidence that the Bankruptcy Court relied at all on a factual

determination that shell arbitrage had actually occurred, no less "in large part."  Shell arbitrage

appears to have been at most a collateral matter, and there is no basis to believe that the

Bankruptcy Court committed a material error.

C.      The PRE certifications

Benun contends that, at three points, the Bankruptcy Court erred in certain factual

determinations regarding Benun and supplier PRE.  At the first point, the Bankruptcy Court

noted Benun's inability to produce at trial the statements required by the ICP that PRE certify

that suppliers had acquired their shells from domestic sources, contrasting this with the evidence

Benun had presented to the ITC.  386 B.R. at 98.  Benun's objection is merely that the

certifications were not required by the ICP and that, rather, Benun voluntarily asked PRE to

supply them.  Either way, PRE's certifications of source were not produced at trial.  Benun does

not explain the significance of what appears to be no more than a correction of a very minor

detail.

At the second point, the Bankruptcy Court again noted that Benun had not produced any of the certifications at trial.  Id. at 105.  The Bankruptcy Court also stated: "Benun/Jazz did not follow up with PRE to assure that shells provided by PRE truly qualified as having been first sold in the United States."  Id.  Benun objects that the uncontroverted evidence at trial showed that Benun reviewed PRE's records on a regular basis to ensure compliance with the U.S. first sale requirement.  The half-page of testimony Benun cites, however, simply does not support this: in the testimony, Benun describes reviewing Jazz's business records to look at the amount of shells purchased from PRE.  (FD 335 at 189:6-17.[2])  In this testimony, Benun did not claim to have followed up with PRE to ensure that its shells met the first sale requirement.  Benun has failed to provide any basis to conclude that the Bankruptcy Court's inference about PRE followup was clearly erroneous.

Benun also points to the Bankruptcy Court's statement of findings regarding willful and malicious injury in Tranche II, in which it stated: "eventually, Benun's apparent failure to enforce PRE's documentation requirements (the required certifications as to source), and otherwise inspect PRE's purchases, was more than mere recklessness."  386 B.R. at 106-107.  Benun bore the burden of proof of permissible repair, which required first sale in the U.S.  The Bankruptcy Court found that Benun showed that he initially made good faith efforts to comply with the legal requirements for permissible repair, but did not show that he continued to make good faith efforts to comply.  On appeal, Benun has pointed to nothing, save the quibble over whether the ICP

---

[2] "FD" refers to item numbering set forth in "Fuji's Amended Designation of the Record on Appeal."

26

required the certifications, that indicates that the Bankruptcy Court erred in this factual determination, no less that it was clearly erroneous.  Benun does not even suggest that the Bankruptcy Court erred in finding that Benun's failure to provide evidence of compliance supported a negative inference about his state of mind regarding infringement.

Benun next recycles the arguments already reviewed and rejected regarding the basis for its willful and malicious Tranche II findings.  Benun adds that the determination of willful and malicious injury is inconsistent with the finding of initial good faith efforts.  This is meritless, ignoring the time sequence central to the Bankruptcy Court's view of the case.

D.    The presumption of regularity

Benun argues that the Bankruptcy Court erred by overlooking the presumption of regularity doctrine: "The 'presumption of regularity' supports official acts of public officers.  In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties."  Butler v. Principi, 244 F.3d 1337, 1340 (Fed. Cir. 2001).  Benun contends that, under this doctrine, it could rely on the presumption that Customs was enforcing the ITC's orders and preventing the importation of infringing shells into the U.S. There are two problems here.  First, conspicuously absent from Benun's briefs is any citation to the record showing how it argued the presumption of regularity doctrine to the Bankruptcy Court, and this Court will not find that the Bankruptcy Court erred in failing to consider an argument if the argument was not presented to it.  Second, the doctrine carries no weight here because of the clear evidence to the contrary that infringing shells were, in fact, somehow turning up in the U.S. – a fact that Benun does not dispute.

E.      Errors in the liquidation of Fuji's claims

Benun next argues that the Bankruptcy Court made the clearly erroneous factual determination that Benun failed to demonstrate first sale in the U.S. for 40% of the Tranche II shells.  Benun concedes that the Bankruptcy Court based this determination in large part on research evidence developed by Fuji.  As Fuji notes, the Bankruptcy Court expressed concern about the small sample sizes in this research evidence, but concluded: "Nevertheless, in the final analysis, this sampling is the only direct evidence available to this court which tests the origin of sale of actual Jazz LFFPs."  386 B.R. at 100.  The Bankruptcy Court also found the fact that the ITC had relied on this research in its factual determinations to be persuasive.  Id.  Benun fails to offer a basis for this Court to find clear error here.

Benun next contends that the Bankruptcy Court erred when it determined that Benun should have caused Jazz to begin sorting out LFFPs with foreign languages on the wrappers as of October 1, 2002.  It is not clear what relevance this has to Benun's failure to demonstrate first sale for 40% of Tranche II LFFPs.

Benun next argues that the Bankruptcy Court erred as a matter of law by not finding that Fuji's sales of shells to the Haase companies constituted a U.S. first sale.  Again, this argument misses the mark: the Bankruptcy Court found, as a factual matter, that Benun's proofs that the Haase shells were of U.S. origin, and thus met the first sale requirement, were not adequate.  386 B.R. at 95-96.  The Bankruptcy Court was not persuaded by Benun's attempt to use the evidence of Fuji-Haase sales as evidence that Haase sold Benun LFFPs that met the U.S. first sale requirement.  Id.  Benun does not explain how Fuji's sales to Haase are evidence of Haase's sales to Jazz, nor what error was committed by the Bankruptcy Court in concluding as it did.

28

Benun argues that the Bankruptcy Court erred as a matter of law by "blindly" adopting the royalty rate established in District Court I, in violation of Federal Circuit law, as stated in Applied Med. Res. Corp. v. United States Surgical Corp., 435 F.3d 1356, 1363 (Fed. Cir. 2006). Benun has misunderstood the structure of the Federal Circuit's analysis in Applied Med. Applied Med. concerned sales of infringing surgical equipment products in two consecutive time periods. Id. at 1360. The Federal Circuit held that the district court erred in adopting the royalty determination for the earlier time period as the royalty determination for the later period. Id. at 1361. It decided this by reviewing the district court's application of collateral estoppel under the law of the regional circuit. Id. at 1359-1360. Because it found that the law of collateral estoppel of the regional circuit required that the issues be identical, and because the damages issues pertaining to the two periods of infringement were not identical, it found that the district court had correctly rejected the application of collateral estoppel. Id. at 1360-1362.

In the instant case, on appeal, as Fuji notes, Benun has failed to recognize the role of collateral estoppel in the Bankruptcy Court's decision, and has argued the matter without reference to it. Instead, Benun's argument relies on the incorrect proposition that Applied Med. created a per se rule that requires separate damages analyses in cases with multiple periods of infringement.[3] Benun does not present an issue preclusion analysis, nor attack the Bankruptcy Court's application of issue preclusion as to royalty rate, nor explain why the reasonable royalty

---

[3] This Court rejects Benun's argument that Applied Med. established a per se rule precluding issue preclusion involving royalty determinations. As discussed above, to the contrary, the Federal Circuit reviewed the district court's collateral estoppel decision using the law of the regional circuit. Id. at 1359-1360. The Federal Circuit clearly contemplated – and did not reject – the possibility that the relevant collateral estoppel requirements could be met, and that, in some cases, it might be appropriate to find that the royalty rate in a later period of infringement had been decided in litigation concerning an earlier period.

determination is not identical.  Thus, while this Court completely agrees with Benun that <u>Applied Med.</u> states the relevant framework for review, Benun has failed to recognize what that framework is.  In the absence of argument that the Bankruptcy Court erred in its application of the Third Circuit's law of collateral estoppel to the royalty rate question, and supporting analysis, this Court has no basis to find that the Bankruptcy Court erred as a matter of law in finding that issue preclusion required adopting the royalty rate established in District Court I.

Benun contends that the Bankruptcy Court erred by basing the determination of the number of cameras sold by Jazz in 2003 on the amount determined in a proceeding before the International Trade Commission ("ITC II").  386 B.R. at 101 (citing FD 64, Ex. P-118A at 91 n.67).  Fuji observes that this was the only evidence on the matter of 2003 sales that was presented to the Bankruptcy Court.  Under Federal Circuit law, "[t]he district court can attribute whatever persuasive value to the prior ITC decision that it considers justified."  <u>Texas Instruments v. Cypress Semiconductor Corp.</u>, 90 F.3d 1558, 1569 (Fed. Cir. 1996).  This Court finds no basis to conclude that the Bankruptcy Court erred in its determination of the number of cameras sold by Jazz in 2003.

Benun also contends that the Bankruptcy Court committed reversible error by giving ITC II exhibits "the equivalent of a rebuttable presumption of admissibility."  386 B.R. at 85.  This point fails for vagueness, as Benun does not specify which exhibits are at issue, or how this ruling caused him prejudice.

      F.    <u>The Sesame Street™ cameras</u>

Benun contends that the Bankruptcy Court erred in making the factual determination that, as to the sale of Sesame Street™ LFFPs in 1998, Benun's inducement of infringement

constituted willful and malicious injury.  386 B.R. at 111.  Benun argues that the determination

was contrary to the evidence presented at trial.  In making this determination, the Bankruptcy

Court pointed to the testimony of Jazz employee Szeto, the manager responsible for this order,

who testified that she knew that these LFFPs were newly molded and infringed Fuji's patents,

and the evidence that Szeto and Benun were in "constant contact."  Id.  The Bankruptcy Court

found it "inconceivable" that Benun and Szeto had not discussed such an unusual and large

order.  Id.  The Bankruptcy Court's determination that Benun's inducement of infringement

constituted willful and malicious injury is not clearly erroneous.

Benun contends as well that the Bankruptcy Court erred and overstepped its bounds by

questioning Szeto on the witness stand.  The Federal Rules of Evidence do not support finding

error: "The court may interrogate witnesses, whether called by itself or by a party."  F. R. Evid.

614(b).

## CONCLUSION

For the reasons stated above, the February 29, 2008 decision of the Bankruptcy Court is

affirmed in part and vacated in part.  As to the denial of the award of prejudgment interest, the

decision is vacated, and the matter is remanded to the Bankruptcy Court for further proceedings

in accordance with this Opinion.  As to the remaining issues on appeal, the decision of the

Bankruptcy Court is affirmed.

    s/ Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.

Dated: December 1, 2008

31